1

2

3

4

5

6

7  **IN THE UNITED STATES DISTRICT COURT**

8  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10  MARYANN  LANKFORD,    )    Case No. 1:07-cv-01668-TAG
            )

11            Plaintiff,   )    MEMORANDUM DECISION AND ORDER
            )    ON PLAINTIFF'S APPEAL FROM

12    v.            )    ADMINISTRATIVE DECISION
            )

13  MICHAEL J. ASTRUE,    )    ORDER REMANDING CASE PURSUANT TO
  Commissioner of Social Security,  )    SENTENCE FOUR OF 42 U.S.C. § 405(g)

14              )
         Defendant.  )    ORDER DIRECTING CLERK TO ENTER

15              )    JUDGMENT IN FAVOR OF PLAINTIFF
  _____)    AND AGAINST DEFENDANT

16

17          Plaintiff Maryann Lankford ("Claimant" or "Plaintiff") seeks judicial review of an

18  administrative decision of the Commissioner of Social Security ("Commissioner" or "Defendant")

19  denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security

20  Act ( "Act"), 42 U.S.C. § 1381 *et seq.*  Claimant filed her complaint on November 14, 2007.  (Doc.

21  1).  The matter has been fully briefed by the parties.  (Docs. 17, 21, 23).

22          Pursuant to 28 U.S.C. § 636 (c) and Fed. R. Civ. P. 73, the parties consented to proceed

23  before a United States Magistrate Judge, and by order dated April 7, 2008 and docketed on April 8,

24  2008, this action was assigned to the United States Magistrate Judge for all further proceedings.

25  (Doc. 11).

26                      **PROCEDURAL HISTORY**

27          Claimant's application for supplemental security income was filed on February 9, 2004.

28  (Administrative Record ("AR")  95).  Claimant alleged a disability onset date of June 29, 1999,  and

initially described her disabling condition as spinal stenosis.  (AR 95, 98).  Claimant reported that her condition limited her ability to work as an in-home services provider because it caused her considerable trouble walking, sitting, standing, climbing, bending, kneeling, twisting, lifting, and carrying.  (AR 99).  The Commissioner initially denied Claimant's  application on April 16, 2004 (AR 43-47) and her subsequently filed request for reconsideration (AR 50-55).

On October 1, 2004, Claimant filed a request for a hearing before an administrative law judge ("ALJ").  (AR 56).  On March 4, 2005, ALJ William C. Thompson, Jr. conducted a hearing and heard testimony from Claimant and vocational expert, Susan Creighton Clavell.  (AR 444-481).  Claimant was represented by counsel at the hearing (*id*.) and at all other times throughout these proceedings since October 1, 2004.  (AR 25).

On April 28, 2005,  ALJ Thompson issued written findings and orders, concluding that Claimant was not disabled and therefore not eligible for SSI benefits under the Act.  (AR 32-39).  On or about June 28, 2004, Claimant asked the Appeals Council to review the ALJ's decision.  (AR 88).  The Appeals Council did so, vacating the initial hearing decision of April 28, 2005, and remanding the matter to the ALJ for resolution of specified issues.  (AR 90-92).

On August 2, 2006, ALJ Thompson conducted the remand hearing.  (AR 444, 482).  Claimant was present and assisted by counsel.  (AR 482).  The ALJ heard testimony from Claimant and vocational expert, David Dettmer.  (*Id*.)  On May 25, 2007, the ALJ issued a written decision, again concluding that Claimant was not under a disability from and after February 9, 2004, and, therefore, not eligible for SSI benefits.  (AR 16-24).  On June 27, 2007, Claimant asked the Appeals Council to review this second decision, which request was denied on September 24, 2007 because the Appeals Council found "no reason under our rules to review the Administrative Law Judge's decision."  (AR 6, 10).  The ALJ's decision became the Commissioner's final decision in the matter.  Claimant timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g).

## SCOPE AND STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision to deny benefits under the Social Security Act.  *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision (made through the ALJ) when the determination is not based on legal error

2

and is supported by substantial evidence. See *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services* , 812 F.2d 509, 510 (9th Cir. 1987). "The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983) (citing 42 U. S. C. § 405(g)). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan,* 888 F.2d 559, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988.) And it "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (citations omitted). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). On review, the Court will consider the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989) (quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not the court, to resolve conflicts in the evidence. *Richardson*, 402 U.S. at p. 400. If the evidence supports more than one rational interpretation, one of which supports the Commissioner's decision, that decision must be upheld. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Moreover, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or non-disability, the finding of the Commissioner is conclusive (*Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987)) unless an improper standard was applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health & Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## RELEVANT LEGAL AND REGULATORY FRAMEWORK

For purposes of Title XVI of the Act, a claimant seeking SSI benefits must demonstrate that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A),

3

42 U.S.C. § 1382c(a)(3)(A).  The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step sequential evaluation process for determining whether a person is disabled under Title XVI of the Act.  (20 C.F.R. § 416.920(a).)  Step one determines whether the claimant is engaged in substantial gainful activities.  (20 C.F.R. § 416.920(a)(4)(i).)  If he is, benefits are denied.  If not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments.  (20 C.F.R. § 416.920(a)(4)(ii).)  If the claimant does not have a severe impairment, a combination of impairments, or meet the duration requirement, the disability claim is denied.  (*Id.*)  If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment meets or equals one of the listed impairments and satisfies the duration requirement, the claimant is conclusively presumed to be disabled.  (20 C.F.R. § 416.920(a)(4)(iii).)  If the impairment does not, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from doing work performed in the past. (20 C.F.R. § 416.920(a)(4)(iv).)  If the claimant is able to perform his or her previous work, he is not disabled.  (*Id.*)  If the claimant cannot perform this work, the fifth and final step in the process determines whether s/he is able to perform other work in the national economy in view of his age, education and work experience.  *See Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287 (1987).  (20 C.F.R. § 416.920(a)(4)(v).)

The initial burden of proof rests upon a claimant to establish that she "is entitled to the benefits claimed under the Act."  *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)(citations omitted).  In terms of the five-step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ shares the burden at each step."  *Tackett v. Apfel*, 180 F.3d 1094, 1098

4

& n.3 (9th Cir. 1999) (italics in original).  The initial burden is met once a claimant establishes that a physical or mental impairment prevents him or her from engaging in his previous occupation.  The burden then shifts to the Commissioner to show (1) that the claimant can perform other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform.  *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

## THE ALJ'S FINDINGS

Here, the ALJ found that Claimant had not engaged in any substantial gainful activity since January 28, 2004, the protected filing date of Claimant's application for benefits (AR 18)[1]; that Claimant had severe impairments of degenerative disc disease of the lumbar spine and lung disorder, but that Claimant did not suffer from a heart condition that was "severe" (AR 18).  The ALJ also found that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (*Id.*) In making the latter finding, the ALJ said that he had "considered the 1.00 and 3.00 series and [found] that the claimant [did] not meet the requirements of those series of listings nor any other listing.  Furthermore, no treating or examining physician [had] mentioned findings equivalent in severity to the criteria of any listed impairment."  (*Id.*)

With respect to Claimant's residual functional capacity, the ALJ found that Claimant could stand and walk in combination for six hours in an eight-hour workday with unrestricted sitting the remainder of the day; lift and/or carry 20 pounds occasionally and ten pounds frequently; bend, stoop, twist, squat, kneel, crawl, and climb stairs occasionally but never climb ladders or scaffolds; and never work at heights, temperature extremes, or respiratory irritants.  (AR 18-19).  The ALJ stated that, in making this finding, he "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p."  (AR19).  He further stated that, in reaching this particular conclusion,  the opinion evidence in the entire record  was evaluated according to the requirements of 20 C.F.R. §  416.927 and Social Security

---

[1]  In her application for SSI benefits, Claimant stated the date she allegedly became disabled was June 29, 1999.  (AR 95).

5

Rulings Numbers 96-2p, 96-5, 96-6p, and 06-3p.  (*Id.*)

The ALJ concluded that Claimant could not perform her past relevant work as an in-home health care service provider, a position performed at the medium exertional level.  (AR 23). Considering Claimant's age, education, work experience in combination with her residual functional capacity, the ALJ found that jobs existed in the national economy Claimant could perform and to which she could make a successful adjustment.  (AR 23, 24).  The ALJ was assisted in reaching this conclusion by the testimony of the vocational expert.  (AR 24).  As a consequence of these determinations, the ALJ found Claimant not to be disabled as defined by the Act.  (AR 24).

**ISSUES**

In her Opening Brief ("AOB" (Doc.17)), Claimant asserts the following errors:

1.  The ALJ failed to provide clear and convincing reasons for rejecting Claimant's testimony regarding the severity of her symptoms, thus improperly discrediting Claimant's subjective complaints.  (AOB at pp. 15-25).

2.  The ALJ improperly failed to consider medical evidence regarding Claimant's obesity and its effects on her ability to work.  (AOB at p. 25).

3.  The ALJ overlooked significant relevant evidence in determining Claimant's residual functional capacity.  (AOB at p. 28).

4.  The ALJ'S vocational findings lacked substantial evidence.  (AOB at p. 33).

**STATEMENT OF FACTS**

The facts have been presented in the administrative hearing transcript, the ALJ's decision, and the briefs filed by Claimant and the Commissioner.  Only those facts critical to deciding the issues before this Court will be addressed as part of the analysis of the  claims of error.  However, some general information will be provided here.

Over the course of these proceedings, Claimant's allegedly disabling conditions have come to be identified, primarily, as degenerative disc disease of the lumbar spine, lung disorder, and, at least as of the first administrative hearing, obesity.  Claimant suffered from chronic severe pain, weakness, fatigue, sleep apnea, chronic bronchitis, chest pain, high blood pressure, and lower extremity numbness.  At the time of the remand hearing, Claimant was taking a variety of

6

medications to help manage the symptoms of her disorders, including, but not limited to, Vicodin, Neurontin, and nitroglycerin.

In February of 2004, the time Claimant filed for Supplemental Security Income benefits under the Act, she was 35 years old. She had been separated from her husband for several years and had begun living with her mother at the first of 2004. (AR 96, 98). Claimant's two young daughters, one about twelve years old at that time and the other about nine (AR 487-488), shared the family home. (AR 449). In her initial filing, Claimant reported that she suffered from spinal stenosis[2] that rendered her unable to continue working as a caregiver. Because of the "intractable pain" Claimant experienced as the result of her condition, Claimant could no longer walk, sit, stand, climb, bend, kneel, twist, lift and/or carry items of anything more than negligible weight . (AR 99, 101). She reported her alleged disability began in late June of 1999. (AR 95). Claimant was 5 feet 2 ½ inches tall and claimed to normally weigh about 234 pounds. (AR 487).

Claimant's outside-the-home employment history is minimal. (AR 106-108). Claimant had no earnings from outside employment in 1994, 1995, or 1996. (*Id.*) She worked full-time for Molly Maid of Modesto in 1997 as a residential house cleaner for two to six weeks, earning a modest amount of wages. (AR 106, 455, 489). In that capacity, Claimant vacuumed, swept, and performed other tasks typically involved in residential housecleaning. (AR 489). In 1998, Claimant worked for Stanislaus County Police Activities League[3], again earning a small sum of money. (AR 106). Her job responsibilities included canvassing residential neighbors, identifying households in need of different kinds of services. (AR 122, 489). Claimant began working as in-home support services provider in 1999, and worked in that capacity until 2004. Claimant's earnings throughout the 1999-2004 period, again, appear to have been minimal. (AR 106-108).

---

[2] Lumbar spinal stenosis is defined as "narrowing of the lumbar spinal canal, which produces pressure on the sciatic nerve roots (or sometimes the cord) before their exit from the foramina, causing positional back pain and symptoms of nerve root compression." *The Merck Manual of Diagnosis and Therapy*, 328 (18th ed. 2006).

[3] During the course of her testimony at the August 2, 2006 administrative hearing, Claimant described the employer-agency as "A & U." (AR 489). In her Work History Report filed as part of her SSI application, Claimant described the job as "Airport Neigbers [*sic*] United." (AR 120, 122).

Claimant reported that the in-home supportive services she was providing at the time of her disability were delivered to her mother. (AR 123). Claimant described those services variously as doing cleaning, taking her mother to doctor's appointments, bathing her, dispensing medications, "all of her necessities." (AR 488). Activities included vacuuming, laundry, housekeeping chores, etc. (AR 123). Earlier in her in-home supportive services work history, Claimant had also provided supportive services to her father[4]of much the same kind, including dressing him, taking him to chemotherapy sessions, and ensuring that the respiratory assistive equipment used in her father's end-of-life care was operating properly. (AR 451). At that time, Claimant also prepared meals for her parents. (AR 452). From time to time, Claimant also was called upon to lift her parents' "scooters," although the details of the lifting and/or carrying were not provided. (AR 452-453).

At those times when Claimant had been able to provide supportive services to her mother, Claimant described the levels of physical exertion required to perform that work as walking about four hours per day; standing about four hours per day; sitting about 20 minutes each day; stooping about 30 minutes during the workday; kneeling about 20 minutes per day; crouching about 30 minutes during the workday; handling, grasping or grabbing big objects about 15-20 minutes per day; and reaching about 20 minutes each day. (AR 123). Doing this work required Claimant to lift and carry objects as part of her job. Claimant described her physical exertion efforts as using the vacuum cleaner, carrying food bags, and carrying loads of laundry. (*Id.*) Claimant estimated that the heaviest weight she lifted was 20 pounds and that she did so frequently (i.e., 1/3-2/3 of a workday) during the course of a workday. (*Id.*)

Claimants' employment prospects were impacted by the fact that she had not graduated from high school or earned a general equivalency degree. (AR 487). Claimant had been able to complete the 11th grade and she read, wrote and spoke English. (AR 486) Claimant was able to drive. (AR 487, 494).

The medical evidence in the record was provided by a number of acceptable medical sources, including treating physicians, consulting medical examiners, and State Agency physicians who reviewed the medical evidence in the case record. Their various opinions about the Claimant's functional limitations ranged from incapacitating physical impairments to lesser restrictions that

---

[4] At the March 4, 2005 hearing, Claimant testified that her father had died. (AR 451).

would not preclude her from working successfully.

## DISCUSSION

A.     **Substantial Evidence Supports the ALJ's Conclusions Regarding the Weight He Gave to Claimant's Subjective Complaints**.

Claimant argues that the ALJ failed to provide clear and convincing reasons for rejecting her testimony regarding the severity of her symptoms.[5] Claimant's challenge has three components: (1) the ALJ improperly discredited Claimant's subjective complaints on the ground that the severity of her symptoms was not supported by objective medical evidence; (2) the ALJ improperly discredited Claimant's subjective complaints and their resulting limitations based on an isolated and misinterpreted statement of Claimant's physical therapist; and (3) the ALJ's time-limited focus of Claimant's description of her daily activities resulted in a distorted and insufficient assessment of Claimant's credibility.

Initially, the Court notes that Claimant's argument, in its broader iteration, is a bit confusing. Despite some vague statements interspersed throughout this argument, it does not appear that Claimant challenges the propriety of the weight assigned by the ALJ to the opinions of the various medical sources contained in the record. The Court interprets Claimant's argument to be that the ALJ discredited Claimant's excess pain testimony solely because it was not fully corroborated by objective medical findings, and/or that the ALJ's justification for discrediting Claimant's testimony was insufficient because it relied on evidence from 2004 and earlier, thereby failing to consider the worsening of her symptoms after 2004. Neither of these arguments is persuasive.

The Court starts with the settled principle that "[i]n weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. An ALJ's finding that a claimant generally lacked credibility is a permissible basis to reject excess pain

---

[5]  As used by Claimant, the Court understands the word "symptoms" to have the meaning contained in 20 C.F.R. § 416.928 (a): "Symptoms are your own description of your physical or mental impairment. ... Your statements (or those of another person) alone, however, are not enough to establish that there is a physical or mental impairment."

testimony." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  But, absent affirmative evidence showing that the claimant is malingering, "the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing.  General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834, (9th Cir. 1995) (citations and internal quotations omitted).

The ALJ found that Claimant's medically determinable impairments (i.e., degenerative disk disease of the lumbar spine and lung disorder – *see* AR 18) could reasonably be expected to produce some of the alleged symptoms.  (AR 20).  Neither party suggests that there is affirmative evidence in this record of malingering on Claimant's part.  Therefore, the ALJ could properly reject or discount Claimant's testimony and other statements concerning her subjective symptoms only if clear and convincing reasons were given.  There is substantial evidence in this record to show that the ALJ did so here.  The reason he gave for discounting the weight of this evidence was quite clear – "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.*)

First, the ALJ did not discredit or discount Claimant's subjective complaint of excess pain solely on the ground that it was not fully corroborated by objective medical findings.  The ALJ considered the internal consistency of Claimant's various statements about her capacity to perform routine physical activities as well as the degree to which her accounts were supported by objective medical evidence in the record.  In reaching the conclusion that Claimant's statements concerning the intensity, persistence, and limiting effects of her pain were not entirely credible, the ALJ noted that Claimant's descriptions of her daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  (AR 20).

Second, contrary to Claimant's argument, the ALJ did consider Claimant's reports of functional impairments for a relatively expansive time period.  In addition to analyzing her physical abilities in light of activities performed by Claimant in the late 1990s, the ALJ looked at what Claimant did much later in time.  The ALJ cited statements made by Claimant in March 2006 where she reported doing some cooking and housekeeping, a report he apparently found inconsistent with her claim that she was then able to walk, sit, or stand for only very brief periods of time, and that she

was unable to lift and/or carry objects of anything more than minimal weight.  (*Id.*)  The ALJ also observed that Claimant provided in-home supportive services for her parents in 2004[6] and noted that "[s]uch care can be quite demanding physically."  (*Id.*)  The ALJ further noted Claimant's descriptions of the job requirements involved in the work she performed in 2004 as an in-home support services provider and the exertional demands that work imposed on Claimant.  It involved cooking, cleaning, baking, bathing, vacuuming, lifting and carrying bags of groceries, doing laundry and other assorted tasks.  (*Id.*)  Claimant had to walk for three hours, sit for one hour and stand for six hours during an eight-hour day in order to manage these job duties.  *(Id.)*  All of this was noted by the ALJ.  According to him, the tasks performed by Claimant and the exertional demands needed to do those tasks, per Claimant's report, were substantially inconsistent with other testimony Claimant provided, i.e.,  that she could not sit, stand, lift or carry on and after the date of alleged onset (June 1999) because of the pain her back condition produced.

The Commissioner correctly argues that the period during which Claimant worked as a caregiver is relevant to the credibility assessment (and the ultimate disability determination) the ALJ made.  Claimant said her disability began in 1999.  She also said she continued to perform her work as an in-home caregiver through mid-April of 2004.  (AR 98).  That makes the span of those years probative with respect to the issue of credibility involved here – the intensity, persistence, and limiting effects of Claimant's subjective symptoms – regardless of whether Claimant's symptoms worsened after 2004.  What Claimant was able to do during a time period when she claimed to be disabled is relevant to the issue of whether Claimant's reports of disabling pain were as intense, persistent, and/or limiting as Claimant asserted.

Moreover, these inconsistencies between different portions of Claimant's statements and other evidence in the record were not the only reasons given by the ALJ for discounting Claimant's subjective complaints.  The ALJ noted that Claimant's credibility "was not bolstered by evidence suggesting exaggeration of symptoms and limitations.  In a 2005 physical therapy report done by

---

[6]  Claimant alleged an onset disability of June 29, 1999 (AR  95) but did not file the application for benefits until nearly five years later, February 2004.  During most of this time, Claimant provided in-home support services to her elderly and apparently disabled parents.

physical therapist Patricia Tapper[7], it was noted that the claimant had demonstrated 'moderate symptom/disability exaggeration behavior.' " (AR 20).

Claimant argues, essentially, that the ALJ did not properly understand what this language in the referenced report meant. Therefore, it cannot be substantial evidence to support the ALJ's credibility finding, according to Claimant, because it relies on a misinterpreted portion of the report as a whole. Claimant's argument in this regard falls short of its mark. First of all, to the extent that a fairly straightforward statement might lead an otherwise knowledgeable layperson to an erroneous conclusion, it was Claimant's obligation, as part of her burden of proof on the issue of severity of symptoms and functional capacity limitations, to explain the proper interpretation to the adjudicator. This record does not show such an effort on the part of Claimant. Second, in the absence of such a showing, the plain language of the statement does provide some evidentiary support for a reasonable trier of fact to question the degree to which Claimant's subjective complaint can be found entirely credible. An ALJ is allowed to use "ordinary techniques" in evaluating a claimant's credibility. *Light*, 119 F.3d at p. 792. Furthermore, even if it had been error and, therefore, not a proper consideration in discounting the credibility of Claimant's subjective complaints, the ALJ nevertheless articulated other clear and convincing reasons, supported by substantial evidence, for discrediting Plaintiff's subjective complaints of pain. *Batson v. Commissioner of the Social Security Administration*, 359 F.3d 1190, 1196 (9th Cir. 2004).

In discounting the intensity, persistence, or limiting effects Claimant's shortness of breath had on her functional abilities as described by Claimant, the ALJ reasoned (1) Claimant failed to mention this problem in her initial disability report or her subsequent appeals reports; (2) the Social Security Administration interviewer who conducted an initial face-to-face interview with Claimant noted no breathing problems on Claimant's part; (3) Claimant's shortness of breath improved with treatment; (4) although Claimant did receive treatment at a hospital on a few occasions in 2004 and 2005, there was no evidence that these episodes occurred on a frequent basis; and (5) while a

---

[7] The evidence at issue here was actually presented in a report prepared by Jeff Strickler, an occupational therapist, in September 2006, not Patricia Teppler in June off 2005, as Claimant asserts. (AR 343, 345, 356; AOB at p. 23).

pulmonary function test did show moderately severe obstructive airways disease, a chest x-ray revealed no significant abnormalities involving the lungs. (AR 20). These are cogent and specific reasons, supported by sufficient evidence in this record, to discount the degree to which Claimant's subjective complaints involving her lung impairments were to be substantially credited.

The Court next addresses Claimant's argument that the ALJ improperly discredited Claimant's subjective symptoms because those symptoms were not supported by objective medical evidence in this record. Although excess pain testimony cannot be discredited solely on the ground that it is not fully corroborated by objective medical findings, that is not what occurred here. In this case, the ALJ examined the objective medical evidence and found significant discrepancies among what the objective medical evidence showed, what functional impairments Claimant alleged she suffered as a result of her symptoms, and what activities she was able to perform at her claimed levels of subjective symptomatology.

It is proper for the ALJ to consider objective evidence as ***part*** of the analysis upon which she or he reaches a conclusion as to functional impairments resulting from the severity of Claimant's subjective complaints. *Light*, 119 F.3d at p. 792; *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *Morgan v. Commissioner*, 169 F. 3d 595, 600 (9th Cir. 1999). Here, the ALJ reviewed the results of diagnostic imaging done on Claimant's on the cervical and thoracic portions of Claimant's spine in March 2004, the lumbar portion of her spine done in June 2004, and a CT scan of Claimant's lumbosacral spine done in June of 1999. (AR 20-21). The ALJ found it "significant that as far back as 1999, diagnostic images showed 'severe' spinal stenosis at L5-S1 ... . Despite severe spinal stenosis, the claimant was able to work doing in-home health care and engaging in door-to-door activities." (AR 21). The ALJ also noted that two physicians who conducted consultative examinations of Claimant in April 2004 both concluded that Claimant retained exertional and nonexertional capacities far less restrictive than those Claimant said she had. (AR 21). Similarly, another State Agency consultative physician who conducted an examination of the medical evidence (including a June 2004 MRI scan showing marked herniation and marked stenosis) concluded, in September 2004, that claimant retained the capacity to do work at the light exertional level with

occasional postural limitations. (AR 21).[8]  In March 2006, a third consultative examining physician,

specializing in neurology and orthopedics, observed Claimant walk without the assistance of a cane

(albeit slowly) and get up on the examining table and off that table independently as part of the

examination process.  The medical consultative examiner concluded that Claimant could perform

work at the light exertional levels with some postural limitations, functional capacities that Claimant

maintained she could not perform.[9]  (AR 22).

> In light of the foregoing, the Court concludes that the ALJ cited clear and convincing reasons

for rejecting Claimant's subjective complaints regarding the intensity, duration, and limiting effects

of her symptoms; that the ALJ's reasons were properly supported by the record; and that those

reasons were sufficiently specific to allow this Court to conclude that the ALJ rejected Claimant's

testimony on permissible grounds and did not arbitrarily discredit her testimony.  There was no error

here.

**B.**      **The ALJ Did Not Err in Evaluating the Evidence of Impairments Properly Before Him When Determining Claimant's Residual Functional Capacity**.

> Claimant argues that the ALJ failed to evaluate her "well documented allegations of knee

pain and bowel incontinence" in making his residual functional capacity finding.  (AOB at pp. 29-

31).  According to Claimant, the ALJ also failed to consider the side effects of the medication

Claimant was then taking to manage the symptoms of her conditions and "failed to consider the

vocational significance of Plaintiff's use of a nebulizer."  (AOB at pp. 31, 33).

> In addressing these claims, the Court begins by recognizing that "[t]he claimant bears the

---

[8]  Also important was the ALJ's notation that Claimant had indicated in an October 2004 appeals report that her condition and limitations had not changed since her last appeals report done the previous April.  The ALJ observed that, "[i]n essence, the fact that the findings of the [State Agency consultants] before and after [the June 2004] MRI findings match each other is consistent with the claimant's own admission that her condition had not worsened during that period."  (AR 21).

[9]  Claimant argues that the evidentiary value of this opinion is suspect because this medical examiner did not have Claimant's MRI scans available to her.  While that omission is clearly unfortunate, the consultative examiner was able to gather a medical records history from the Claimant and conduct a physical examiner of Claimant sufficient to allow the examiner to form an assessment of Claimant's physical capacities. That assessment was consistent with the conclusions reached by several other medical consultants who reached similar conclusions about Claimant's capacity. The record reflects that at least two of those physicians did have available to them diagnostic images of Claimant's spines showing severe stenosis (the earlier consult)  and severe stenosis and marked herniation (the later consultation).  (AR 21, 167).

burden of proof that she is disabled. She must present 'complete and detailed objective medical reports of her condition from licensed medical professionals.' " *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). 20 C.F.R. § 416.912(a) advises applicants for supplemental security income benefits that "[i]n general, you have to prove to us that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s). 20 C.F.R. § 416.912(c) cautions claimants, "You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say you are disabled. You must provide evidence ... showing how your impairment(s) affect your functioning during the time you say you are disabled, and any other information that we need to decide your claim."

Claimant did not satisfy her evidentiary burden with respect to her "well documented allegations of bowel incontinence." Claimant did not testify to the existence of such a condition at either of the administrative proceedings conducted in this matter. (AR 444-507). None of the medical evidence in this record contains an opinion by an acceptable medical source that this condition was of such severity that it would interfere with or significantly impact Claimant's ability to perform basic work-related activities. The March 30, 2006 report of the examining medical consultant, Dr. Susana Greenawald, noted that Claimant maintained she had experienced bowel incontinence for the past five years and that she had discussed this problem with her primary care doctor (AR 305) but the medical evidence in the record does not bear this out. (AR 305). Dr. Greenawald's report further noted that, with respect to this condition, there had been no testing or clear diagnosis made. (*Id.*) Dr. Kerwin noted a diagnosis of fecal incontinence in his 2006 Lumbar Spine Residual Functional Capacity Questionnaire. (AR 387). Nothing more than this very brief, conclusory notation about Claimant's alleged incontinence is contained in Dr. Kerwin's report. Although Dr. Kerwin's medical  conclusions are discussed in the ALJ's decision, "little weight [was given] to this opinion as there [were] no treatment records submitted by this doctor," there was no information about the nature, frequency and length of the treatment relationship between this doctor and Claimant, and there was no evidence that Dr. Kerwin had even examined Claimant prior to rendering an opinion in this matter. (AR 23).

15

Where there is a medical opinion that indicates or suggests that an impairment has an effect on the claimant's ability to work, the impairment must be figured into the residual functional capacity analysis. *See Beecher v. Heckler*, 756 F.2d 693, 695 (9th Cir. 1985). However, a condition need not be considered in determining residual functional capacity if there is no medical opinion suggesting that the condition contributes to the Plaintiff's inability to work, or if such opinion has been properly discredited. *Goodenow-Boatsman v. Apfel*, 2001 U.S. Dist. LEXIS 2567, **28-30. Application of these principles to the evidence before the ALJ on the issue of Claimant's bowel incontinence leads us to conclude that the ALJ did not err in failing to consider the impacts of this condition in reaching a residual functional capacity determination.

Claimant's argument with respect to her alleged knee pain is flawed in much the same ways. At the March 2, 2006 administrative hearing, Claimant testified very briefly to her "knee problem." (AR 497). Claimant testified that "they found arthritis in [her] knee and spurs." (*Id.*) She said they had found a tear in her knee and would find out at her next doctor's appointment whether surgery would be proposed. (*Id.*) Claimant did not describe the degree of pain, if any, she suffered, nor did she explain how this knee condition impaired her functional abilities or to what extent. In fact, this information is nowhere in the medical record evidence before the ALJ. None of the medical progress notes in this record contain any references to knee pain. There were two reports from diagnostic imaging centers in this record, one dated January 26, 2006 and the other dated April 8, 2006, both involving Claimant's right knee. (AR 338, 339). The findings from the January 2006 examination state, in pertinent part:

> ... The osseous structures demonstrate normal mineralization and bony anatomical alignment. There is no radiographic evidence of fracture, dislocation, or bony lesions. There is mild joint space narrowing demonstrated in both the medial and lateral compartment without evidence of degenerative osteoarthritic changes. There are small spur formations demonstrated on the tibial eminence. The patellofemoral joint space appears to be well preserved. There is no evidence of joint effusion or gross soft tissue abnormality.

(AR 339). No diagnosis is offered. (*Id.*)

The findings from the second evaluation, an MRI scan done on the same knee a little less than three months later, showed:

> The quadriceps and patellar tendons are intact. The medial and lateral collateral ligaments are normal. The anterior and posterior cruciate ligaments are intact.
>
> The anterior horn of the lateral meniscus is remarkable for mild irregularity and abnormal signal intensity that reaches the inferior articular margin and is consistent with a small tear. The medial meniscus is normal.
>
> The subchondral bone and articular cartilage is remarkable for mild irregularity of the articular cartilage over the lateral femoral condyle and lateral tibial plateau.
>
> The patellar cartilage is normal. There is no evidence of knee effusion. There is no evidence of a Baker's cyst. (AR 338).

According to the reported conclusions of the imaging medical professionals, these findings were consistent with a small tear in the meniscus. (*Id.*)

The Court has found no objective medical evidence in the record that Claimant suffered from osteoarthritis in her right knee. Claimant did not testify that her alleged knee problem impaired her functioning in any manner or to any degree. Even Claimant's reports of pain made to the staff at the diagnostic imaging centers did not describe its frequency or its intensity. Again, Claimant bears the burden of proof that she is disabled. She must present medical and other evidence that the Commissioner can use to reach conclusions about her medical impairment(s). And she must provide medical evidence showing that she has an impairment, how severe it is during the period of disability, and how this impairment affects her functioning during the time she says she was disabled. 20 C.F.R. § 416.912. Given the absence of this information, the ALJ was not required to consider her alleged knee impairment in determining Claimant's residual functional capacity.

There is a second reason for the Court's conclusion that no error occurred in failing to consider Claimant's alleged knee problems in determining Claimant's residual functional capacity. Claimant's attorney submitted two written briefs to the ALJ outlining Claimant's arguments and authority to the ALJ for use in determining disability. (AR 67-69, 85-87). Disorders of the spine and lung impairments, complicated by Claimant's obesity, are the only impairments identified. Functional limitations or impacts did not include Claimant's right knee. Claimant's counsel had the diagnostic imaging reports involving Claimant's right knee at least three months before he prepared and submitted his trial brief to the ALJ for the August 2006 administrative hearing. (AR 85).

There was no mention of any knee problems during Claimant's testimony at the first hearing (AR 444-481) and little more than a passing reference to a knee condition at the second hearing (AR 482-597, 497).   Under these circumstances, the Court concludes that Claimant has waived this argument by her failure to raise it in a forthright manner at the administrative level where the ALJ would have had the opportunity to explore and  address the issue and its supporting evidence in the manner contemplated by the regulatory scheme.  *Meanel,* 172 F.3d at p. 1115.

Claimant also asserts that, in determining her residual functional capacity, the ALJ did not consider the effects of the side effects of medication Claimant was taking.  It is true that, at the first administrative hearing in March 2005, Claimant testified to taking certain medications which produced various side effects, i.e., dizziness, sleep disruption, and nausea.  (AR 462-463).  At the second administrative hearing, however, no testimony was given on the side effects, if any, that she was then experiencing on her current medication regimen, the duration of any side effects, what times during the day she took these medications, and/or what the functional implications for basic work-related activities of any such side effects might have been.  (AR 482-507).  Moreover, the hypotheticals posed to the vocational expert by Claimant's attorney did not incorporate any functional impacts or limitations attributable to the side effects of Claimant's medications, e.g., dizziness, nausea or fatigue.  (AR 503-504).  Under these circumstances, it appears that Claimant did not provide the evidence necessary to allow the ALJ to make a sufficiently informed determination on this issue.  *Sanchez v. Secretary of Health & Human Serv.*, 812 F.2d at p. 511; *Allen v. Secretary of Health & Human Serv.*, 726 F.2d 1470, 1472 (9th Cir. 1984); *Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir. 1986);  20 C.F.R. § 416.945(a)(3)(in general, the claimant is responsible for providing the evidence used by the Commissioner in making a finding about a claimant's residual functional capacity).  Moreover, Claimant did not raise the issue at the administrative hearing nor did she argue it in her briefing to the ALJ.  (AR 67-69, 85-87, 482-507).  The Court notes that Claimant "was represented by counsel who knew that all relevant evidence should have been brought to the ALJ's attention. ... [A]t least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings to preserve them on appeal." *Meanel*, 172 F.3d at p. 1115.  Here, the Court cannot say that excusing a failure to comply with this waiver rule is necessary to

avoid a manifest injustice (*id.*); consequently, the Court will not do so.

Claimant also maintains that the ALJ erred in determining Claimant's residual functional capacity because he "failed to consider the vocational significance of Plaintiff's use of a nebulizer." (AOB at p. 33). Claimant argues that she uses the machine every day, three times a day, and that she would need to take additional breaks in order to do so, further eroding the job base. (*Id.*) But nowhere does Claimant cite us to evidence that use of this machine could not be done at times that would not disrupt a regular work schedule. Absent such evidence, Claimant essentially argues that the ALJ should have speculated about the possible impacts use of such a treatment would have on Claimant's workday routines. That would have been error. Issues not raised before the ALJ are not preserved on appeal. *Meanel*, 172 F.3d at 1115.

## C.    The ALJ Erred in Failing to Consider the Effect of Claimant's Obesity on Her Ability to Work.

There are two stubborn facts here. The first is that, in his initial decision dated April 28, 2005, ALJ Thompson found that "[t]he medical evidence indicates that the claimant has a back disorder and *obesity*, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination, to one [*sic*] of the impairments listed in Appendix 1, Subpart B, Regulations No. 4." (AR 33-34). At the time of the first administrative hearing that preceded the issuance of this decision, the Claimant testified that she was 5 feet, 2 ½ inches tall and weighed 231 pounds. (AR 449). At the administrative hearing conducted after the remand, Claimant testified to the same height and weight of approximately 234 pounds. (AR 487).

As mentioned above, Claimant's attorney prepared a trial brief for the ALJ's consideration at the August 2, 2006 administrative hearing. (AR 85-87). The pleading was described as *Supplemental Statement of the Case on Remand* and was dated July 27, 2007. (AR 85). According to the date stamp on the cover page, the Social Security Administration field office received the document on that same date. (*Id.*) In this brief, Claimant argued:

///

///

The claimant's listed impairments are chronic low back pain, spinal stenosis, osteoarthritis, enlarged heart, chronic asthma, obesity – 5'3" @ 210 lbs.

*Evaluating Obesity:*  The claimant's obesity clearly combined with her physical impairments, i.e., and severe obstructive airway disease and severe lower extremity disability affects her day to day activities.  The claimant's ability to perform routine movement and necessary physical activity with the work environment needs to be assessed.

The combined effects of obesity with other impairments may be greater than might be expected without obesity, i.e., obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems; obesity makes it harder for the chest and lungs to expand; this means the respiratory system must work harder to provide the needed oxygen, this in turn makes the heart works harder to pump blood to carry oxygen to the body and because the body is working harder at rest, its ability to perform additional work is less than would be otherwise expected.

Obesity has effects upon the claimant in her ability to perform routine movement and necessary physical activity with the work environment [*sic*].  Individuals with obesity may have problems with the ability to sustain a function over time.  Someone with obesity and an affected weight bearing joint may have more pain and limitation than might be expected if they were not obese.  Fatigue may also affect the individual's physical and mental ability to sustain work activity.

If the obesity is such a level that it results in an inability to ambulate effectively, it alone may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria) with the involvement of one major peripheral weight bearing joint in listing 1.02A or 101.02A. (Hip, knee or ankle.)

One can also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirement of a listing, but the combination of impairments is equivalent in severity to a listed impairment.

This claimant's listed impairment or disability equal to a listed impairment is **1.04C (1.00B2b) - Disorders of the Spine (spinal stenosis, osteoarthritis and scoliosis).**  (AR 86).

The entire document is marked as Exhibit 13B (AR 85-87); Exhibit 13B was one of the exhibits received into evidence at the August 2, 2006 hearing (AR 485).

The second stubborn fact here is that ALJ Thompson did *not* find Claimant's obesity to be a severe impairment in his remanded decision even though Claimant's height and weight remained virtually unchanged since the previous hearing *and* Claimant continued to insist that her obesity significantly interfered with her ability to perform basic work activities over the course of a regular work day.  Having already found Claimant's obesity to be a "severe" impairment in his first decision, it is difficult to un-ring that bell under the circumstances here, e.g., no dramatic weight loss, no evidence of improved levels of physical activity or physical condition.  Thus, Claimant's

obesity remained a "severe impairment" either alone, or in combination with her other medically determinable physical impairments, and that, as such, it impacted her physical ability to do basic work activities in more than minimal ways.[10]

As noted above, Claimant maintained that her excess weight aggravated her musculoskeletal impairment(s) as well as her lung disorder, both of which the ALJ did find to be severe impairments in his May 25, 2007 decision. (AR 18, 86). At the remand hearing, Claimant testified to severe back pain which was treated with medication, Neurontin and Vicodin. (AR 490, 491, 495). Claimant also testified to significant difficulties in standing and walking for any extended period of time without experiencing fatigue. (AR 493, 494). Claimant testified to using a motorized scooter in order to supervise the grocery shopping she did with her daughter's active assistance. (AR 494). Claimant testified to experiencing sleep apnea throughout the night, requiring the use of a portable oxygen assistive device to provide constant positive air pressure while she slept. (AR 417, 420, 491, 492). The record shows that equipment prescribed for this purpose was to be used nightly for eight to ten hours, with estimated length of need for this equipment to be 99 months. (AR 421). Claimant testified to heart related problems, i.e., experiencing chest pain with some frequency that required treatment with nitroglycerin to alleviate the symptoms. (AR 497-498). She testified to having high blood pressure that she manages with medication. (AR 500). Claimant also testified to ambulation problems involved her right foot and leg. (AR 498). Claimant testified that she had a stroke at the end of February 2006 which produced a severe noticeable drag on her foot when walking. (AR 498).

Dr. Greenawald, whose March 30, 2006 opinion was assigned substantial weight by the ALJ (AR 22, 305-311), noted that upon examination, Claimant was able to ambulate independently and without the use of a cane, but that she did so slowly. Claimant could climb onto and off of the examination table independently but, again, slowly. Claimant could not bend over or otherwise manipulate her limbs to get her socks back on. Dr. Greenawald noted at different points in her report

---

[10] In having concluded previously that Claimant's obesity was a severe impairment, this Court will assume that finding was reached in compliance with the guidelines set forth in Social Security Ruling No. 02-1p wherein it states that "an individualized assessment of the impact of obesity on the individual's functioning [is done] when deciding whether the impairment is severe." SSR No. 02-1p at note 6.

that Claimant's obesity made physical examination difficult. Dr. Greenawald noted that Claimant

should not work over uneven terrain, suggesting concerns with balance and/or ambulation. (AR 305-

311).

In posing his hypotheticals to the vocational expert at the remand hearing, Claimant's counsel

included limitations in walking, balancing, reaching, climbing, stooping, and crouching. (AR 503,

504). All of these limitations can be correlated, directly or indirectly, with obesity. Although it is

not possible to know with any precision the degree to which one or more of these impacts might

erode the job base otherwise available to Claimant, the answer of the vocational expert indicated that

it would to some degree. (*Id.*)

Social Security Ruling No. 02-1p addresses the evaluation of obesity in Titles II and XVI

disability claims. It recognizes that

> Obesity is a risk factor that increases an individual's chances of
> developing impairments in most body systems. It commonly leads to, and
> often complicates, chronic diseases of the cardiovascular, respiratory, and
> musculoskeletal body systems. Obesity increases the risk of developing
> impairments such as type II ... diabetes mellitus ...; gall bladder disease;
> hypertension; heart disease; peripheral vascular disease; dyslipidemia ... ;
> stroke; osteoarthritis; and sleep apnea. ... Obesity may also cause or
> contribute to mental impairments such as depression. The effects of
> obesity may be subtle, such as the loss of mental clarity and slowed
> reactions that may result from obesity-related sleep apnea.

Social Security Ruling No. 02-1p further provides that in conducting the sequential

evaluation process, the Agency will consider obesity in determining whether the individual has a

medically determinable impairment; whether that impairment was severe; whether the individual's

impairment, or combination of impairments meets or equals the requirements of a listed impairment

in the listings; and whether the individual's impairments prevent him or her from doing past relevant

work and other work that exists in the national economy. And in assessing the individual's residual

functional capacity, the predicate to determinations at steps four and five of the sequential process,

the Agency will consider all the claimant's medically determinable impairments of which the

Commissioner is aware, including medically determinable impairments that are not "severe."

20 C.F.R. § 416.945(a)(2).

///

Further assurance that due consideration will be given to obesity as a complicating factor in any disability determination is found in various sections of Part 404, Subpart P, Appendix 1, including Section 1.00Q.[11]

> *Effects of obesity*. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

Despite all of this, there is no mention of obesity in the ALJ's May 25, 2007 decision, let alone any analysis of how that condition did not have a significant impact on issues of severity, listing equivalencies, or residual functional capacity, either singly or in combination with her degenerative disc disease of the lumbar spine and lung disorder. This Court is hard-pressed to conclude that such omissions are anything but legal error.

Defendant Commissioner argues that the holding and reasoning in *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005) should control the outcome of this case, rather than the opinion in *Celaya v. Halter* 332 F.3d 1177 (9th Cir. 2003). Defendant Commissioner acknowledges the ALJ erred by failing to address the issue as required by Social Security Ruling No. 02-1p. However, he asserts that such error should not be considered "reversible" because Claimant was represented by counsel at the remand hearing and Claimant's argument here is "boilerplate," lacking in any explanation as to why the ALJ's failure to address the issue of obesity was incorrect, and devoid of any specific connection between the ALJ's failure to address properly Claimant's obesity and her allegedly disabling conditions. (Respondent's Brief ("RB") (Doc. 21) at pp. 8-9). The Court disagrees.

Defendant Commissioner argues that Claimant's counsel at the remand hearing never once indicated that Claimant's obesity should be further analyzed . Actually, counsel for Claimant did request further consideration of the issue at the remand hearing; he raised the obesity issue "four

---

[11] Section 1.00 covers disorders of the musculoskeletal system. Similar language is found in 3.00 I (effects of obesity in respiratory system disorders).

square" in his trial brief.

This case is unlike *Burch* in several ways. As already mentioned, Claimant's obesity as a severe impairment appears to have been decided at the initial administrative hearing in this case. Absent new evidence of changed circumstances – evidence not demonstrated in this record – the issue of obesity as a severe impairment appears to be "a given" under the doctrine of preclusion. *Cf. Ruiz v. Apfel,* 24 F.Supp.2d 1045, 1050 (C.D.CA 1998). Moreover, one of the rationales for finding no error in *Burch* at step three of the sequential evaluation process was that Burch did not specify which listing she believed she met or equaled. *Burch,* 400 F.3d at pp. 682-683. In this case, Claimant did so in her trial brief. (AR 86). And, unlike the claimant in *Burch*, here Claimant did introduce evidence that could tend to show her obesity condition exacerbated her musculoskeletal and respiratory systems disorders[12] – excess pain, weakness, sleep apnea, use of assistive equipment every day and night to address her persistent shortness of breath, chest pains (with use of nitroglycerin tablets), decreased lung capacity, inability to ambulate effectively and safely, and possibly a stroke leaving her ambulatory abilities and balance further compromised. And, unlike in *Burch*, the ALJ in this case did not utter the word "obesity" anywhere in his May 25, 2007 decision. Such silence is not permitted by SSR 96-8p or SSR 02-1p.

Under these facts, it is not sufficient to argue that Claimant did not meet her burden of proof. If more information was needed to determine with some degree of confidence the extent to which Claimant's obesity impacted her ability to perform basic work activities during the course of a normal work day, it was the ALJ's duty to develop the record more fully. *DeLorme v. Sullivan*, 924 F. 2d 841, 849 (9th Cir. 1991). The fact that Claimant was represented by counsel does not lessen that responsibility in any significant way, under the circumstances presented here. "In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered. *Thompson v. Schweiker*, 665 F.2d 936, 941 (9th Cir. 1982). This ///

---

[12] This Court is not the trier of fact and does not presume to draw any conclusions about the weight or significance of this evidence. That is the job of the Administrative Law Judge. The Court's ability to review the propriety of the ALJ's decision is foreclosed by the absence of any findings or analysis in the ALJ's decision about the issue of Claimant's obesity and whatever functional impacts it may, or may not, have had on her work-related capacities.

y exists even when the claimant is represented by counsel. *See Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir.1981)." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

**D.** **There is Insufficient Evidence to Support the ALJ's Finding at Step Five of the Sequential Evaluation Process.**

At the August 2, 2006 hearing, the ALJ posed a hypothetical to the vocational expert that assumed a less restrictive non-exertional limitation than the one he eventually arrived at in determining the Claimant's residual functional capacity. Specifically, the ALJ asked the vocational expert to assume that the Claimant could not work in an environment where she would be exposed to *excessive* respiratory irritants. When the ALJ actually reached a decision on Claimant's residual functional capacity, the ALJ provided that Claimant could *never* work near respiratory irritants, excessive or otherwise, as part of his residual functional capacity finding. Logically, this complete ban on any respiratory irritants, a more restrictive limitation than the "excessive exposure" restriction posed in the ALJ's hypotheticals, would erode the job base further, thus increasing the chances of reaching a disability determination in Claimant's favor.

Here, the ALJ found that Claimant was unable to perform any past relevant work. (AR 23). It thus became the Commissioner's burden to prove that the Claimant was not disabled by showing that there were a significant number of jobs in the national economy the claimant could do, given her age, education, work experience and residual functional capacity. *Tackett*, 180 F.3d at p. 1099. There are two ways to do this – through the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines in the regulations. (*Id.*) Here, the ALJ chose to use the testimony of a vocational expert. When using a vocational expert in this fashion, the Commissioner must demonstrate that the claimant can do other kinds of work "by eliciting the testimony of a vocational expert in response to a hypothetical that sets out all the limitations and restrictions of the claimant." *Andrews v. Shalala*, 53 F.3d 1035, 1040 (9th Cir. 1995). That did not happen here. The hypotheticals posed to the vocational expert posited a capacity to work in environments where there was some exposure (less than excessive) to respiratory irritants; the residual functional capacity that was ultimately established precluded work in environments where any respiratory irritants existed. No evidence was introduced about the availability of work for Claimant in this more restricted

environment. That divergence resulted in a failure of proof necessary to meet the Commissioner's burden of showing ability to engage in work and the availability of such jobs in the national economy.

Defendant Commissioner would have this Court conclude that any error here was harmless by implying certain findings about the levels of exposure to respiratory irritants in those categories of jobs the vocational expert testified Claimant could perform. That is the role of the ALJ, not this Court. "We are constrained to review the reasons the ALJ asserts. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575 (1947); *Pinto v. Massanari*, 249 F.3d 840, 847-848 (9th Cir. 2001). It [is] error for the district court to affirm the ALJ's ... decision based on evidence that the ALJ did not discuss." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is not free of legal error. Therefore, the Court orders that:

1. Plaintiff's social security complaint, Doc. 1, IS GRANTED, as set forth above;

2. This matter IS REMANDED pursuant to sentence four of 42 U.S.C. § 405(g), for proceedings consistent with this opinion, to further develop the record regarding the current status of Plaintiff's obesity and, if Plaintiff's current diagnoses include that condition, to determine whether the combination of all Plaintiff's severe impairments, including obesity, meets or medically equals any one of the listed impairments in 20 C.F.R., Pt 404, Subpart P, App.1; if it does not, to further consider what, if any, functional impacts Plaintiff's obesity has on her ability to perform basic work-related tasks in combination with her other severe impairments; to further consider whether Plaintiff retains the residual functional capacity to perform her past relevant work, including a review of Plaintiff's current health status and a review of the continuing viability of the ALJ's previous finding regarding the credibility of Plaintiff's subjective complaints in light of any new, revised, or updated medical evidence, addressing that issue according to the guidelines of 20 C.F.R. § 416.929 and Social Security Ruling 96-7p; and, if Plaintiff remains unable to perform her past relevant work, to further consider whether Plaintiff can perform other types of substantial gainful work that exist in sufficient numbers in the national economy; and

3. The CLERK OF COURT is DIRECTED to ENTER JUDGMENT for Plaintiff Maryann Lankford and against Defendant Michael J. Astrue, Commissioner of Social Security, and to close this file.

IT IS SO ORDERED.

Dated:   **March 26, 2009**                                    _____**/s/ Theresa A. Goldner**_____
                                                               UNITED STATES MAGISTRATE JUDGE